# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

|  |  |
|---|---|
| A black and silver iPhone 6, model number A1586, with a shattered front screen, which is currently located at the Milwaukee Field Office of the Bureau of Alcohol, Tobacco, and Firearms, 1000 N. Water Street, Suite 1400, Milwaukee, WI, 53202, under investigation number 778040-16-0047, item number 000078. | Case No. __18-M-1318__ |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Sections 922(a)(1), 922(d)(1), and 922(g)(3) and Title 21, United States Code, Section 841(a)(1).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

ATF Special Agent Richard Connors
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: __10/22/18__

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin _____     Hon. William E. Duffin , U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Richard Connors, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of propert—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am employed as a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) assigned to the Milwaukee Field Office since October of 2015. I have been employed as a full time law enforcement officer for over 3 years. I have received training at the Federal Law Enforcement Training Center in Glynco, GA. I attended the Criminal Investigator Training Program, as well as ATF's Special Agent Training Program. I have received training in the investigation of unlawful possession of firearms, the unlawful transfer of firearms, and the unlawful dealing in firearms without a dealers' license. Prior to becoming a Special Agent with the ATF, I received two bachelor's degrees from Northern Illinois University in the fields of Sociology and International Relations. I have received a Master's degree from Northern Illinois University in the field of American Government.

1

3. I have training and experience in investigating narcotics and firearms trafficking, As a law enforcement officer, I have authored many criminal complaints and search and seizure warrants, and I have participated in the execution of warrants, at which times controlled substances, firearms, ammunition, records or receipts pertaining to such, and U.S. currency have been seized. I have debriefed defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations and firearms trafficking. I am familiar with narcotics traffickers' methods of operation including the distribution, storage, importation, and transportation of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. Furthermore, I know large-scale drug traffickers use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store information related to their drug trafficking, as well as to conduct drug trafficking activities.

4. I have participated in several trafficking investigations that involved the use of social media as a means of commmunitcation for the individuals involved in firearms and drug trafficking. Social media allows the user to send and receive pictures/text messages/audio calls, etc. in order to facilitate their transactions.

5. I have participated in several trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these

2

computers, cellular phones, cameras, and other digital storage devices. On many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

6.      The facts in this affidavit come from my personal observations, my training and experience, information obtained from witnesses, and information obtained from other agents during the course of their official duties, all of whom I believe to be truthful and reliable.

7.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8.      The property to be searched is described as a **black and silver iPhone 6, model number A1586**, with a shattered front screen, hereinafter "the **Device**." The **Device** is currently located at the ATF Milwaukee Field Office, 1000 N. Water Street, Suite 1400, Milwaukee, WI, 53202, under investigation number 778040-16-0047, item number 000078.

9.      The applied-for warrant would authorize the forensic examination of the **Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

3

## PROBABLE CAUSE

10. The United States is investigating Antwuan D. PUGH, and others, concerning possible violations of Title 18, United States Code, Section 922(g)(3) (possessing firearms or ammunition as an unlawful user of or as an addict to any controlled substance); Title 18, United States Code, Section 922(d)(1) (selling or disposing of any firearm or ammunition to a known felon); Title 18 United States Code, Section 922(a)(1) (dealing firearms without a license); and Title 21, United States Code, Section 841(a)(1) (distribution of a controlled substance).

11. Through the course of the investigation, as detailed below, case agents have identified Antwuan Pugh as an individual supplying controlled substances and firearms to individuals located in the Milwaukee community.

### A. Vehicle Stop of Antwuan PUGH and Search Warrant at the PUGH Residence

12. On December 1, 2015, City of Miwaukee Police Department officers (MPD) conducted a traffic stop of a 2000 black Lincoln town car, bearing state of Wisconsin license plate 922-XXN. Antwuan PUGH (DOB XX/XX/1993) was driving the aforementioned vehicle, which was registered to his mother. During a search of the vehicle, MPD recovered 0.7 grams of green leafy substance that field tested positive for THC, the active ingredient in marijuana. Also recovered from Antwuan PUGH's person was a White Samsung touchscreen cell phone, model number SM-

4

G360T1. Shortly after the traffic stop, MPD executed a search warrant at 8142 N. Granville Road, Milwaukee, WI, 53224.

13.    On December 1, 2015, upon his arrest, Antwuan PUGH gave a recorded statement after being read his Miranda rights which PUGH understood and agreed to waive. Antwuan PUGH stated he always smokes marijuana when he feels in a "chill" mood. Antwuan PUGH stated he was arrested after officers located a bag of marijuana in his vehicle. Antwuan PUGH further stated that his brother, Kenyon PUGH, has access to his bedroom at the residence on N. Granville Road and would utilize it to change clothing and occasionally leave personal items.

14.    Law enforcement believes Antwuan PUGH and his older brother, Kenyon PUGH resided at 8142 N. Granville Road, Milwaukee, WI on December 1, 2015. Agents had conducted surveillance at the residence, and observed Antwuan PUGH exiting in and out of the residence on several occasions, and entering and exiting a 2000 black Lincoln town car, bearing state of Wisconsin license plate 922-XXN.

15.    Officers searched the bedroom believed to be shared by Antwuan and Kenyon PUGH, and recovered the following: (1) paper identifiers for Kenyon PUGH, along with an envelope marked "Tweezy," a known nickname for Antwuan PUGH; (2) 1.9 grams of green leafy plant like substance which field tested positive for the presence of THC; (3) two firearms: an Armscor of the Philippines handgun, model M1911-A1-FS, .45 caliber, bearing serial number RIA1686424; and a Glock handgun, model 21, .45 caliber, bearing serial number TNY752. Law enforcement located

5

several assorted brands and calibers of ammunition and several different magazines for firearms throughout the house. Additionally, law enforcement located the following empty gun boxes in the residence: Glock hangun boxes, model 23, .40 caliber, bearing serial numbers MHZ778, MHT876, PVL502; Glock handgun box, model 21, .45 caliber, bearing serial number TNY752; Glock handgun box, model 22c, .40 caliber, bearing serial number GHU315; one black plastic Intratec, 9mm, firearms case; one black plastic firearms case for a Armscor of the Philippines handgun, model M1911-A1-FS, .45 caliber, bearing serial number RIA1686424; one plastic black Plano firearms case; and one black cardboard Bersa handgun box for a model Thunder 45, .45 caliber, bearing serial number SG2977.

16.     Antwuan PUGH has never been convicted of a felony offense.

**B.    Antwuan PUGH's Post-Arrest Statement and Other Records**

17.     On December 1, 2015, during Antwuan PUGH's recorded mirandized statement, Antwuan PUGH stated that the firearms located in the house were in his bedroom and that both firearms in his bedroom were purchased by a girlfriend. Antwuan PUGH stated he bought three or four guns that year and had already sold them. Antwuan PUGH stated he sold a Glock firearm on the "street" and he did not know the person's name, Email, or phone number. Antwuan PUGH further stated that he had the two Glock firearms from the cases in his bedroom, but he sold those as well. Antwuan PUGH stated he has never bought a firearm at a gun store and only off of "Armslist" because it is cheaper.

6

18. Based upon the investigation, the PUGHs are suspected of purchasing eleven firearms off of "Armslist," many of which have been recovered during the commission of crimes throughout the City of Milwaukee.

19. On April 21, 2016, affiant received copies of reported wages from the Wisconsin Department of Workforce Development (DWD) for Antwuan and Kenyon PUGH. The DWD report outlines a person's reported earnings for any given particular year. In 2015, the PUGH brothers reported earning a combined $243.86. In November of 2015 alone, Antwuan PUGH spent a combined $1,700 on four Glock handguns from two different individuals.

## C. Antwuan and Kenyon PUGH's Post Search Warrant Activity

20. On March 11, 2016, Kenyon PUGH was a victim of a non-fatal shooting where he was struck in the left calf. The incident occurred at 6448 N. 106th Street, Milwaukee, WI. Located at the scene was a white Lexus RX300 bearing state of Wisconsin License plate number 274-XET. A check of the registration revealed that it listed to to Regina Pugh (Kenyon and Antwuan PUGH's mother). Located in the center console of the vehicle was one black 9mm M&P magazine containing four unfired 9mm Aguila cartriges. Recovered from the scene were four (4) spent 9mm Aguila shell casings. Witnesses observed an individual running from the scene where the shooting occurred. This individual jumped into a Yellow, Chevrolet Monte Carlo. Footage from the hospital where Kenyon PUGH was taken showed Kenyon PUGH being dropped off in a Yellow, Chevrolet Monte Carlo.

7

21.     Kenyon PUGH was interviewed at the hospital regarding this incident. Initially, Kenyon PUGH stated his name was Antwuan PUGH. Kenyon PUGH also stated the shooting occurred at a different address. Recovered inside of Kenyon PUGH's pocket was a key to the Lexus, which was recovered from the scene of the shooting. When investigators confronted Kenyon PUGH regarding the inconsistencies in his statement, he continued to deny any involvement with the white Lexus, and the shooting on 106th Street.

**D.     Antwuan PUGH's Cell Phone**

22.     On June 29, 2017, your affiant obtained a federal search warrant signed by the Honorable Magistrate Judge David Jones for one white Samsung touchscreen cell phone bearing serial number 354335/07/551193/3, which was recovered from Antwuan PUGH on December 1, 2015.

23.     On July 10, 2017, affiant examined the contents of the Samsung Touchscreen cell phone. The first section examined was entitled "Facebook Chat." Affiant is aware that individuals can utilize "Facebook Messenger" to communicate with other persons who have Facebook accounts. Individuals can utilize "Facebook Messenger" without a wireless connection to their mobile devices. Facebook Members can utilize any wi-fi network to access "Facebook Messenger." Your affiant recognized the Facebook profile "Twez Knockavitch" as a previous Facebook profile for Antwuan PUGH. Affiant viewed pictures for this Facebook profile, and these pictures match an MPD booking photo of Antwuan PUGH.

8

24.    On several posts made by this profile, the user states his/her telephone number is 793-2282, which is the number that Antwuan PUGH provided to MPD on December 1, 2015, as referenced in Paragraph 19 of this affidavit.

25.    Throughout the Facebook chat, the user "Twez Knockavitch" makes several posts regarding narcotics and firearms. For example, between February 29, 2016 and August 20, 2017, the user "Twez Knockavitch" refereced the sale and acquisition of marijuana and ecstacy and sent photographs depicting what appears to be marijuana and ecstasy pills to potential customers. With regard to firearms, between February 16, 2016 and July 26, 2017, the user "Twez Knockavitch" referenced the sale and acquisition of firearms by referring to kinds and prices of firearms and sent photograhps depicting what appears to be firearms to potential customers. Additionally, the profile "Twez Knockavitch" made several references to possessing "heats," which I know is a common street term for a firearm.

26.    Furthermore, on November 23, 2015, the profile "Twez Knockavitch" posted the following comment in a group chat setting: "I shot they ass up the nigga momma don't want me to hurt him she gave me 375 cause the pulled off wit my pills." Further in the conversation, this user posts "I gave dude the pills he got in the truck like he was gonna count them instead he pulled off I shot 12 times fuck they van up I turn around they seen me shot once I roll my window down shot my last 3 pulled off made sure I want followed duck my car at Jessie crib call my nigga and he called his mom she paid me." Affiant believes Antwuan PUGH refered to the shooting that occurred on November 22, 2015, at 86XX N. 106th St., Milwaukee, WI. At the time of

9

the shooting, witnesses observed a black Lincoln town car speed away from the scene of the shooting. Law enforcement officers know that at the time of the shooting, Antwuan PUGH operated a black Lincoln town car bearing state of Wisconsin license plate 922-XXN, as evidenced by the vehicle stop on December 1, 2015, and as detailed in Paragraph 12 of this Affidavit. On December 1, 2015, law enforcement recovered the Armscor of the Philippines handgun, model M1911-A5, .45 caliber, bearing serial number RIA1686424, in Antwuan PUGH's bedroom, as detailed in pagagraph 15 of this affidavit. This firearm NIBIN tested positive to the shell casings recovered from the scene of the shooting that occurred on November 22, 2015 on 106th Street.

27. Affiant examined the text message portion of the cell phone. Your affiant observed several messages between Antwuan and Kenyon PUGH, dated November 30, 2015, regarding the sale and trade of firearms, types of firearms, and prices of firearms. Antwuan PUGH sent photos of firearms to Kenyon PUGH as well. Also in November 2015, Antwuan PUGH exchanged several text messages with other individuals who were inquiring about firearms that he had for sale. The subject of these message often included the prices of firearms.

28. Affiant examined the photo portion of the cell phone. Affiant was able to view several pictures of handguns that Antwuan PUGH sent to various individuals. On November 24, 2015, Antwuan PUGH created a photo of what appears to be him holding a model 1911, .45 caliber handgun, the same caliber handgun used in the shooting on November 22, 2015. Your affiant was able to view several different types of firearms displayed within the contents of Antwuan PUGH's cell phone.

10

**E. Antwuan PUGH's Facebook account "Tywaun Knockavitch"**

29. On August 25, 2017, your affiant obtained a federal search warrant for the contents of the Facebook page "Tywaun Knockavitch" with a corresponding Facebook ID of 10011308302732. The warrant was authorized by the Honorable Judge William E. Duffin. Your affiant obtain the results of that warrant on Septmeber 27, 2017, the results covered the date of December 1, 2014 through August 25, 2017. Your affiant examined the posts and identified several key conversations that demonstrate narcotics and firearms distribution commited by Antwuan PUGH. For example, on January 18, 2017, "Tywaun Knockavitch" engaged in a conversation with "Darius Low" where Low requested "130 a half." Your affiant is aware that "half" can often refer to a half ounce of an illegal substance, with "130" referring to the price for half an ounce." In addition, from the date ranges between March 7, 2016 and August 20, 2017 Antwuan PUGH referred to sales and purchases of ecstasy. For example, on April 2, 2017, Antwuan PUGH conversed with "PrettyPetty Tey" who inquired about the price of pills. Antwuan PUGH responded, "5" and sent a picture of pills believed to be ecstasy.

30. Antwuan PUGH also made several references to the acquisition and sale of firearms within his Facebook page from dates ranges February 16, 2016, through July 26, 2017. For instance, between May 21-23, 2017, Antwuan PUGH conversed with "East Mil" regarding the sale/purchase of firearms. Antwuan PUGH sent pictures of the different firearms that were for sale. Antwuan PUGH refers to

11

two of the firearms as "9mm," and your affiant believes the third firearm photograph to be an AK-47.

**F.    Antwuan PUGH's Facebook account "Twez Knockavitch"**

31.    In September of 2017, your affiant located the Facebook profile for Antwuan PUGH under the alias "Twez Knockavitch" with a Facebook User ID number of 100013882987756.  Affiant observed the photographs of the individual depicted on the profile page and positively identified Antwuan PUGH.  The most recent post on the page is a picture of Antwuan PUGH which was posted publicly on October 28, 2017.[1]  The picture posted on October 28, 2017, shows Antwuan PUGH holding what appears to be a marijuana cigarette while  riding in a vehicle. Your affiant believes this is the same Facebook profile used to discuss the shooting that was previously described in this affidavit.

32.    On January 22, 2018, your affiant observed the previous Facebook profile "Twez Knockavitch," had been changed to a different name. The name associated with the Facebook page listed as "Deshaun Robinson."  Regardless of the name change, your affiant observed the profile picture of this page and the photo of Antwuan PUGH remained as the profile picture. Your affiant is aware that the process to change one's name on Facebook is as simple as clicking on "settings" and then "edit name." Your affiant checked the URL and Facebook ID for the page

---

[1] The former Facebook profile for "Twez Knockavitch" and current profile "Deshaun Robinson" are not open to the public.

"Deshaun Robinson." The URL and Facebook ID are identical for the previous page "Twez Knockavitch" and the current profile page "Deshaun Robinson."

33.     On January 22, 2018, your affiant obtained a federal search warrant for the contents of the Facebook page "Twez Knockavitch" with a corresponding Facebook ID of 100013882987756. The warrant was authorized by the Honorable Judge William E. Duffin. Your affiant examined the contents of the Facebook report provided by Facebook on February 12, 2018. The following posts were located within the contents of the Facebook page "Twez Knockavitch:" On July 9, 2017, the profile "Dashaun Robinson" provided "April Quartz" with the phone number for Antwuan PUGH stating, "I don't be on this page call me when u get a chance." In October 2017, on this page conversations occurred between Antwuan PUGH and others regarding the sale of a firearm and marijuana.

## G.     Antwuan PUGH's Facebook Account "Tywaun Knockavitch" (Re-filed on May 30, 2018)

34.     On May 30, 2018, your obtained a federal warrant for updated content on the Facebook page "Tywaun Knockavitch." The contents of the Facebook report provided from Facebook, Inc. covered the date range of August 25, 2017 through May 30, 2018. A review of these contents revealed that Antwuan PUGH has continued to traffic in illegal substances and firearms.

35.     On May 30, 2018, "Tywaun Knockavitch" and "Dee Solo" discussed "Dee Solo's" purchase of pills from Antwuan PUGH. In this conversation, Antwuan PUGH also attached a picture of the pill bottle, and at one point indicated that he also needed

13

to contact Antwuan PUGH's brother, "You hit bro." Throughout the chats, with different individuals, continued to have conversations regarding the sale of pills.

36.     On May 12, 2018, in a chat between "Tywaun Knockavitch" and "Arquan Jackson," "Tywuan Knockavitch displayed a photograph of a firearm. Based upon the chat, your affiant believes that Antwuan PUGH traded pills for the firearm stating, "Just got it from my nigga I gave his all the pills..."

Tywaun Knockavitch: (Sent photo)



## H.   Controlled Purchase of prescription narcotics from Kenyon PUGH

37.     On August 17, 2018, your affiant participated in a controlled purchase of prescription narcotics from Kenyon PUGH. A controlled purchase is an operation conducted by law enforcement, the confidential source (CS) is searched prior to the operation so that no illegal contraband can be introduced during the purchase. The CS is then provided money for the purchase which will be used to obtain the illegal contraband (drugs, firearms etc.). After purchase, the item will be handed them over to law enforcement. The CS is then searched once more for contraband.

14

38.     On August 17, 2018, a CS and an undercover agent drove to the area of N. 107th Street, and W. Brown Deer Road, in Milwaukee County.[2] The CS met with Kenyon PUGH who instructed the CS to meet him at a certain area. Kenyon PUGH indicated to the CS he needed to obtain the pills, but that he would return and meet the CS. At this point in time, your affiant observed Kenyon PUGH pull into the parking lot of 8245 N. 107th St., Apt. # 205, Milwaukee, WI, and park the Green Infiniti SUV (WI Tag NV8477) he was driving. Kenyon PUGH and an unidentified black female exited the vehicle and entered the common door that leads to Apt. # 205. Kenyon PUGH and the black female emerged from the residence approximately two minutes later and drove back to meet the CS and the undercover agent. The CS provided Kenyon PUGH the money and obtained 28 suspected hydrocodone/acetaminophen pills (10 mg/325mg each), 21 suspected alprazolam pills (2 mg each), and 3 suspected oxycodone hydrochloride pills (30 mg each), which the CS turned over to law enforcement officers.

39.     After the transaction occurred, the same Green Inifiti SUV previously driven by Kenyon PUGH returned to 8245 N. 107th Street, Milwaukee, WI, and the same black female exited the vehicle and entered into the common door that leads to

---

[2] I believe that the CS is truthful and reliable because the CS has made statements against the CS' penal interest. In addition, the CS' information was corroborated by other evidence developed during the course of this investigtation. The CS was working with law enforcement as a result of a municipal paraphernalia charge. The CS has previous convictions for narcotic drugs; bail jumping; disorderly conduct (domestic abuse); and possession of heroin.

15

Apt. # 205. The black female soon exited the residence and the Green Inifiti exited the parking lot and drove out of sight.

### I.    Arrest and Search Warrant Execution

40.    On August 21, 2018, United States Magistrate Judge David E. Jones authorized the search of two residences belonging to Antwuan and Keyon PUGH: 8245 N. 107th Street, # 205, Milwaukee, WI, 53224 and 3900 W. Good Hope Road, Apt # 1, Milwaukee, WI, 53209, respectively. Also on August 21, 2018, Magistrate Judge Jones issued an arrest warrant for Antwuan D. PUGH.

41.    On August 22, 2018, the search warrants were executed on the respective residences. Located at Antwuan PUGH's residence, 8245 N. 107th Street, was Kenyon PUGH and Kenyon PUGH's girlfriend. Antwuan PUGH was not located at the residence. Upon a search of Antwuan PUGH's residence, law enforcement located in excess of $12,000, consisting of $100 in "buy money" provided by the CS on August 17, 2018, an unknown amount of prescription narcotics (suspected opiates), a Smith and Wesson handgun, digital scales, multiple cell phones, ammunition, and paper identifiers for Keyon and Antwuan PUGH.

42.    At the time of the search, Keyon PUGH and his girlfriend stated they were unaware of Antwuan PUGH's whereabouts. Kenyon PUGH's girlfriend also stated that she had previously purchased a firearm for Antwuan PUGH and that she frequently smokes marijuana with Antwuan PUGH.

43.    On September 6, 2018, Antwuan PUGH was located and arrested at 8245 N. 107th Street, Unit 205, Milwaukee, WI. Along with Antwuan PUGH in the

16

residence was his mother (R.P.) and his father (A.P.). Your affiant searched Antwuan PUGH's person for dangerous objects (guns, knives, needles, etc) shortly after he was placed into handcuffs. Recovered from Antwuan PUGH's front left shorts pocket was the **Device**. The **Device** was taken and placed into ATF custody where it has remained.

44.    In a post-arrest interview, Antwuan PUGH admitted that the above-identified Facebook accounts belonged to him, and that he sold ecstasy. He further admitted that he has smoked marijuana every day, two times a day, since 2015 and that spends $30.00 a day or $900/month on marijuana.

45.    Based upon the facts described above, that there is probable cause to believe that a search of the information contained within the above described **Device** will produce evidence of a crime, namely evidence related to the possession and trafficking in firearms and controlled substanes; that through affiant's training, experience and discussions with other experienced law enforcement officers, affiant is familiar with the ways in which drug and firearm traffickers conduct their unlawful trade, including their methods of distribution, their utilization of communication devices, their use of coded communications to conduct their transactions, the employment of counter surveillance, their use of false or fictitious identities, and their utilization of various forms of electronic devices to store and/or conceal illegal activity;

46.    Based on my training and experience, affiant is aware that firearms and drug traffickers frequently possess cellular telephones. Based on my training and experience, affiant also knows that cellular phones possess and store records pertaining to the sale and trade of firearms and controlled substances.

17

47.     Based upon my training and experience, affiant knows that individuals involved in firearms and drug trafficking frequently use cellular telephones to maintain contact with their sources of firearms and controlled substances as well as customers and co-conspirators in the sale and distribution of the same; that affiant has also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs; and that affiant is aware the cellular telephone possess the capability to log into and operate Facebook and "Facebook Messenger." Affiant is aware that "Facebook Messenger" is a commonly used method of communication for people who lack sufficient resources for a cellular plan. "Facebook Messenger" is a free application that can be used by anybody that has any type of wi-fi enabled device. Therefore records contained within said **Device** will provide evidence related to the identity of said supplier(s), co-conspirators, and customers.

48.     Based upon my training and experience, affiant also knows that individuals who possess and use drugs such as marjijuana will often arrange these transactions via their cell phones and other messaging applications such as Facebook Messenger. Given Antwuan PUGH's admitted daily use of marijuana, records contained within the said **Device** will likely provide evidence of messages, voice calls, and photographs of marijuana.

49.     Based upon my training and experience, affiant believes it is common for crime suspects who possess controlled substances and and traffick in firearms to

18

often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the controlled substances and firearms that they control, possess, buy, and sell; furthermore, that these photographs and visual depictions are typically kept and maintained on their cellular devices.

50. The **Device** was seized during the execution of an arrest warrant and is currently in the lawful possession of the Bureau of Alcohol, Tobacco, and Firearms (ATF). Therefore, while ATF might already have all necessary authority to examine the **Device**, I seek this additional warrant out of an abundance of caution to be certain that an examination of the **Device** will comply with the Fourth Amendment and other applicable laws.

51. The **Device** is currently in storage at 1000 N. Water Street, Suite 1400, Milwaukee, WI, 53202. In my training and experience, I know that the **Device** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **Device** first came into the possession of the ATF.

## TECHNICAL TERMS

52. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless

19

telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.    Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play

audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or

21

notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.    Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.    IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned

22

an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      h.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      53.     Based on my training, experience, and research, I know that the Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

      54.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

      55.     There is probable cause to believe that things that were once stored on the **Device** may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

24

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

56.     *Forensic evidence.*     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Device** because:

e.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

25

f.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

g.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

h.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

57.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire

26

medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

58.    *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

59.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Device** described in Attachment A to seek the items described in Attachment B.

## ATTACHMENT A

The property to be searched is a black and silver iPhone 6, model number A1586, with a shattered front screen, hereinafter "the **Device**." The **Device** is currently located at the Milwaukee Field Office of the Bureau of Alcohol, Tobacco, and Firearms, 1000 N. Water Street, Suite 1400, Milwaukee, WI, 53202, under investigation number 778040-16-0047, item number 000078.

This warrant authorizes the forensic examination of the **Device** for the purpose of identifying the electronically stored information described in Attachment B.

1

## ATTACHMENT B

1.    All records on the **Device** described in Attachment A that relate to
violations of Title 18, United States Code, Sections 922(g)(3), Title 18, United States
Code, Section 922(d)(1), Title 18 United States Code, Section 922(a)(1), and Title 21,
United States Code, Section 841(a)(1) and involveAntwuan PUGH, including, but
not limited to:

- a. lists of customers and related identifying information;

- b. types, amounts, and prices of drugs and firearms trafficked as well as
  dates, places, and amounts of specific transactions;

- c. any information related to sources of drugs and firearms (including
  names, addresses, phone numbers, or any other identifying
  information);

- d. any information recording PUGH's schedule or travel;

- e. all bank records, checks, credit card bills, account information, and
  other financial records;

- f. Photographs and/or video depicting PUGH in possession of drugs or
  firearms; and

2.    Evidence of user attribution showing who used or owned the **Device** at
the time the things described in this warrant were created, edited, or deleted, such
as logs, phonebooks, saved usernames and passwords, documents, and browsing
history;

1

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2